**\*\*E-filed 5/2/2011\*\***

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

NOREEN SALINAS, et al.,

              Plaintiffs,

  v.

CITY OF SAN JOSE, et al.,

              Defendant.

_____/

No. C 09-04410 RS

**ORDER GRANTING IN PART AND DENYING IN PART THE MOTION OF THE CITY OF SAN JOSE DEFENDANTS FOR SUMMARY JUDGMENT AND DENYING THE MOTION OF DEFENDANT TASER, INTERNATIONAL FOR SUMMARY JUDGMENT**

I. INTRODUCTION

       Steven Salinas died after an encounter with San Jose police officers in which a Taser device was used against him.  In this action, plaintiffs seek to impose liability for Salinas' death against the individual police officers involved in the incident, the police chief, the City of San Jose ("the City defendants") and Taser International, Inc.  The City defendants move for summary judgment contending that the undisputed facts establish there was no constitutional violation and that the officers are entitled to qualified immunity in any event. Taser moves for summary judgment contending that the warnings it provided as to the risks arising from use of its products are sufficient as a matter of law, and that plaintiffs cannot show causation.  Although summary judgment will be

**United States District Court**
For the Northern District of California

1  entered on some aspects of plaintiffs' claims against the City defendants, the motions will largely be

2  denied, as explained in more detail below.

3

4                                              II.  BACKGROUND

5          In the early evening of May 25, 2007, San Jose Police received a report of a disturbance

6  involving a male and a female at the Vagabond Inn, a motel located on North First Street in San

7  Jose.  Police were advised that a woman had possibly fallen out of a window.  Defendants Sgt. Jason

8  Woodall, Sgt. Michael McLaren, Officer Barry Chikayasu, and Officer Roderick Smith responded

9  to the scene.   Sgt. McLaren arrived first, and made contact with Herbert Howard, who was standing

10  outside the room where the disturbance had been reported, and who was later determined to be the

11  person who had called the police.  Sgt. McLaren heard yelling between a male and female from

12  within the room, which plaintiffs characterize as a "verbal disturbance."  Sgt. McLaren was unable

13  to discern what the occupants were saying, and as plaintiffs argue, did not specifically hear any

14  threatening statements.  Conversely, defendants point out, Sgt. McLaren was not able to determine

15  that the situation was benign.  Howard reported that he had been hearing moaning and groaning

16  from the room.

17          Sgt. McLaren observed broken window glass on the ground, but saw no indication that

18  anyone had fallen through the window.  He knocked on the room door, identifying himself as a

19  police officer, and demanded that the occupants open the door.  There was no response, but Sgt.

20  McLaren heard a woman trying to calm a man down, and continued groaning from the man.

21          Officer Chikayasu arrived on the scene, and the officers discussed the fact that Sgt. McLaren

22  had heard arguing.  Sgt. McLaren, who had continued to knock on the door with no response, then

23  slid open one of the room windows by five or six inches.  Officer Chikayasu pulled the curtain aside

24  and looked into the room, where he saw a female who he instructed to open the door.  The woman,

25  later identified as Lenore Salazar, said that everything was fine, but she opened the door.  Around

26  this time, Sgt. Woodall and Officer Smith arrived.  Through the open door, the police officers saw

27  Salinas for the first time.  He was naked, but did not appear injured in any way.

28          Officer Chikayasu and Sgt. McLaren pulled Salazar from the room.  She was handcuffed and

seated by the curb.  Although Salazar appeared uninjured, Sgt. McLaren believed she was in

                                                      2

potential danger from Salinas, who was still yelling, and that she might be under the influence of a drug, possibly PCP.

At this point, there are two versions of what transpired.  Salazar testified that when the officers entered the motel room, they instructed Salinas to turn around and place his hands behind his back, and that he immediately complied.  Salinas was then handcuffed, and pulled to the ground by the handcuffs.  According to Salazar, at least four police officers then proceeded to beat Salinas with batons and, "kept hitting him and hitting him," despite the fact that he was not struggling. Salazar contends Salinas was tased after being handcuffed and beaten.

The police officers describe a markedly different scenario.  After Salazar was removed from the room, they yelled various commands at Salinas, who was unresponsive.  Because Salinas was naked, grunting, agitated, and enraged, and possibly under the influence of PCP, the officers believed it was unsafe to approach him.  At the direction of Sgt. Woodall, Officer Chikayasu fired his Taser device at Salinas, in "dart" mode.  The police officers then rushed him, and attempted to handcuff him.  A fairly lengthy struggle ensued, and he was tased several more times.  Eventually Salinas was brought under control and handcuffed.  He was not tased after the officers gained control, and was never beaten with batons.  The testimony of Herbert Howard, who had reported the disturbance, and that of the motel manager, who also witnessed the events, both generally corroborate the police officers' version of the incident.

After Salinas was handcuffed, paramedics entered the room.  Salinas suffered cardiac arrest. CPR was unsuccessful, and he died at the scene.  An autopsy concluded that Salinas, "most likely did of a lethal cardiac arrhythmia . . . due to a violent struggle . . . during PCP intoxication, in the presence of significant natural heart disease."  The autopsy did not reveal any bruising that the medical examiner believed would be characteristic of baton strikes.

The Taser device used against Salinas was a TASER Model X26 ECD, purchased by and shipped to the San Jose Police Department in August of  2006.  It was packaged with a Training DVD and Operating Manual, and a hard copy of Taser's then current product warnings dated June 8, 2006.  The warnings in these documents repeatedly cautioned that risk of injury and death is inherent in the circumstances under which Taser devices are likely to be used, and included various

1    suggestions for minimizing those risks, including avoiding prolonged or excessive discharges of the

2    device against a subject.  The warnings did not state that use of a Taser device could in itself cause

3    or contribute to death,  suggesting instead that the devices "have been found to be a safer and more

4    effective alternative when used as directed [compared] to other traditional use of force tools and

5    techniques."

6

7                                          III.  LEGAL STANDARD

8              Summary judgment is proper "if the pleadings and admissions on file, together with the

9    affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

10   party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The purpose of summary

11   judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett*,

12   477 U.S. 317, 323-24 (1986).  The moving party "always bears the initial responsibility of

13   informing the district court of the basis for its motion, and identifying those portions of the

14   pleadings and admissions on file, together with the affidavits, if any which it believes demonstrate

15   the absence of a genuine issue of material fact." *Id.* at 323 (citations and internal quotation marks

16   omitted).  If it meets this burden, the moving party is then entitled to judgment as a matter of law

17   when the non-moving party fails to make a sufficient showing on an essential element of the case

18   with respect to which he bears the burden of proof at trial.  *Id.* at 322-23.

19             The non-moving party "must set forth specific facts showing that there is a genuine issue for

20   trial." Fed. R. Civ. P. 56(e).  The non-moving party cannot defeat the moving party's properly

21   supported motion for summary judgment simply by alleging some factual dispute between the

22   parties.  To preclude the entry of summary judgment, the non-moving party must bring forth

23   material facts, *i.e.*, "facts that might affect the outcome of the suit under the governing law . . . .

24   Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby,*

25   *Inc.*, 477 U.S. 242, 247-48 (1986).  The opposing party "must do more than simply show that there

26   is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*,

27   475 U.S. 574, 588 (1986).

28             The court must draw all reasonable inferences in favor of the non-moving party, including

**United States District Court**
For the Northern District of California

4

United States District Court

For the Northern District of California

questions of credibility and of the weight to be accorded particular evidence. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991) (*citing Anderson*, 477 U.S. at 255); *Matsushita*, 475 U.S. at 588 (1986). It is the court's responsibility "to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." *T.W. Elec. Service v. Pacific Elec. Contractors*, 809 F.2d 626, 631 (9th Cir. 1987). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.


IV. DISCUSSION

   A.  The City Defendants

      1.  *The entry*

     Plaintiffs contend that the police acted unconstitutionally at the outset by opening the motel room window and pulling back the curtain to look in. It is well-settled that "[t]he Fourth Amendment protection against unreasonable searches and seizures is not limited to one's home, but also extends to such places as hotel or motel rooms." *United States v. Cormier*, 220 F.3d 1103, 1108-09 (9th Cir. 2000). Law enforcement officers, however, need not obtain a warrant before initiating a search where, "the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *United States v. Snipe*, 515 F.3d 947, 950 (9th Cir. 2008) (quoting *Mincey v. Arizona,* 437 U.S. 385 (1978). The propriety of a search conducted pursuant to claimed "exigent circumstances" is measured under, "a two-pronged test that asks whether: (1) considering the totality of the circumstances, law enforcement had an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm; and (2) the search's scope and manner were reasonable to meet the need." *Snipe*, 515 F.3d at 952.

**United States District Court**
For the Northern District of California

Here, plaintiffs contend that the police lacked an objectively reasonable basis to conclude there was an immediate need to act because (1) the officers had not heard any specific words coming from the motel room that indicated the existence of a threat, (2) there was no sign of any violence, or that a crime had been committed "apart from some sort of vandalism" related to the broken window, and (3) Salazar had informed them everything was alright.  Plaintiffs' characterization of the facts, the essence of which they do not dispute, is unduly strained, however. While the officers may not have heard specific words that could have confirmed a threatening incident was in progress, the yelling and moaning they heard, and that Howard had reported, was sufficient to cause legitimate concern for the safety of the room's occupants, even under plaintiffs' label that it was only a "verbal disturbance."  Additionally, plaintiffs' insistence that there were no signs of violence or any crime other than vandalism is not a fair assessment of the potential import of the broken glass the officers observed.  Although the police may have been able to conclude that it was unlikely the report of a woman falling through the window was accurate, the circumstances suggested it was quite possible that the window had been broken through an act of violence of some sort, not merely by accident, or for no purpose other than "vandalism."

Finally, under the circumstances presented, the officers had every reason not to take Salazar's reassurance at face value.  Indeed, on this undisputed factual record, had the officers left the scene upon hearing Salazar's assertion that everything was alright—either permanently or even to go obtain a warrant—they surely would have been faulted for any harm that thereafter came to Salazar and/or Salinas, a possible outcome that does not seem remote, given the events that actually were unfolding in the room.

Plaintiffs suggest that if the officers were "truly concerned" that this was a domestic violence situation, the appropriate course of action would have been to ask Salazar to step outside and to question her before proceeding.  This argument overlooks the fact that the officers *did* attempt to speak to Salazar at the door, and only opened and looked in the window when she declined to open it.  Once Salazar did open the door, the officers acted on the basis of what they observed as to Salinas' condition.  Accordingly, the undisputed facts establish that under the totality of the circumstances, the police had an objectively reasonable basis to proceed without a warrant and that

United States District Court

For the Northern District of California

1   the scope and manner of their search was reasonable to meet the need.  Partial summary judgment

2   will therefore enter in the City defendants' favor on plaintiffs' claim that the entry was unlawful.

3

4       2.  *Detention*

5       Plaintiffs effectively concede that the police officers' visual observations of Salinas's

6   conduct would, standing alone, justify the attempt to detain and/or arrest him.  Plaintiffs contend,

7   however, that the officers were only able to make those observations as a result of their prior illegal

8   entry and visual search of the room.[1]  Quoting *United States v. Washington*, 387 F.3d 1060 (9th Cir.

9   2004), plaintiffs assert that, "police officers may only gain visual access to a hotel room if (1) the

10  room's occupant voluntarily opens the hotel room door in response to a request (but not a threat or a

11  command), (2) the officers have a warrant, or (3) the officers have probable cause and one of the

12  exceptions to the warrant requirement exists."  387 F.3d at 1070.  In this case, there is no contention

13  that the officers had a warrant, and there likely is at least a question of fact as to whether Salazar

14  opened the door by "request" as opposed to a "threat or a command."  Plaintiffs argue, therefore,

15  that the visual search of the room that allowed the officers to observe Salinas' conduct was improper

16  because the officers lacked probable cause *and* no exceptions to the warrant requirement existed.

17      As discussed above, the undisputed facts establish exigent circumstances sufficient to render

18  a warrant unnecessary.  While plaintiffs may be correct that the City defendants have not argued that

19  the officers had probable cause to suspect a crime had been committed at any time prior to the door

20  being opened, no requirement of such probable cause exists under current law.  In *Snipe*, which

21  plaintiffs elsewhere acknowledge sets out the relevant standards, the Ninth Circuit applied

22  intervening Supreme Court precedent to reject prior formulations that suggested there is a *separate*

23  probable cause element required when conducting a search pursuant to exigent circumstances.

24  *Snipe*, 515 F.3d at 951-952.  Rather, "in an emergency, the probable cause element may be satisfied

25  where officers reasonably believe a person is in danger."  *Id.* at 952 (quoting *United States v.*

26

27  [1]  The officers did not see Salinas through the window when they opened it and drew back the
28  curtain, so that event is not relevant to the analysis.  Even if it were, however, that conduct was not improper, as discussed above.

United States District Court
For the Northern District of California

1   *Holloway*, 290 F.3d 1331, 1338 (11th Cir.2002)).  Thus, to the extent *Washington* can be read as

2   requiring probable cause apart from and in addition to the exigent circumstances, it does not reflect

3   the present state of the law.  Accordingly, the undisputed facts establish that the decision to attempt

4   to detain Salinas was not unlawful.  Even under the version of events recounted by Salazar, there

5   would have been no constitutional violation in instructing Salinas to turn around with his hands

6   behind his back, and in thereafter handcuffing him.  Accordingly, partial summary judgment will

7   enter in the City defendants' favor on this aspect of plaintiffs' claim as well.

8

9          3.  *Excessive force*

10         A claim that a police officer employed excessive force implicates the Fourth Amendment's

11  prohibition on unreasonable seizures.  *Graham v. Connor*, 490 U.S. 386, 394-95 (1989).

12  Accordingly, a police officer's actions are measured by a standard of objective reasonableness.  *Id.*

13  at 397.  The reasonableness of the force used to effect a particular seizure, in turn, is determined by

14  "careful[ly] balancing . . . 'the nature and quality of the intrusion on the individual's Fourth

15  Amendment interests' against the countervailing governmental interests at stake."  *Graham*, 490

16  U.S. at 396 (*quoting Tennessee v. Garner*, 471 U.S. 1, 8 (1985)).  More simply, "[t]he force which

17  [i]s applied must be balanced against the need for that force."  *Liston v. County of Riverside*, 120

18  F.3d 965, 976 (9th Cir. 1997).  *See also Alexander v. City and County of San Francisco*, 29 F.3d

19  1355, 1367 (9th Cir. 1994).  The strength of the governmental interests depends on the "severity of

20  the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or

21  others, and whether he is actively resisting arrest."  *Graham*, 490 U.S. at 396.  It is also important to

22  appreciate that police officers "are often forced to make split-second judgments," and that therefore

23  "not every push or shove, even if it may seem unnecessary in the peace of a judge's chambers" is a

24  violation of the Fourth Amendment.  *Id.* (*quoting Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.

25  1973)).  It is equally true, though, that even where some force is justified, the amount actually used

26  may be excessive.  *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002) (*citing P.B. v. Koch*, 96 F.3d

27  1298, 1303-04 (9th Cir. 1996)).

28         The Ninth Circuit has emphasized that the balancing test just described "requires careful

8

United States District Court
For the Northern District of California

1   attention to the facts and circumstances of each particular case . . . ." *Santos*, 287 F.3d at 853

2   (*quoting Graham*, 490 U.S. at 396).  *See also Deorle v. Rutherford*, 272 F.3d 1272, 1279-81 (9th

3   Cir. 2001).  Because an excessive force claim "nearly always requires a jury to sift through disputed

4   factual contentions, and to draw inferences therefrom," the Ninth Circuit has also instructed that

5   summary judgment in excessive force cases should be granted sparingly.  *Santos*, 287 F.3d at 853

6   (*citing Liston*, 120 F.3d at 976 n.10).  "This is because police misconduct cases almost always turn

7   on a jury's credibility determinations." *Id.*

8          In bringing this motion, the City defendants recognize that summary judgment in their favor

9   on the excessive force claim is simply unavailable on the present factual record unless the testimony

10  of Salazar is wholly disregarded.  Citing *Scott v. Harris*, 550 U.S. 372 (2007), however, the City

11  defendants contend this is the rare case where a witness's testimony is so implausible and

12  contradicted by the other evidence that it may be ignored, on grounds that it could not be accepted

13  by any reasonable jury.  In *Scott*, the plaintiff's account of a high speed auto pursuit was "clearly

14  contradicted" by a videotape of the events.   There was no suggestion the video tape was "doctored

15  or altered in any way, nor any contention that what it depict[ed] differ[ed] from what actually

16  happened."  550 U.S. 378.  The Supreme Court held that the plaintiff's version of events was "so

17  utterly discredited by the record that no reasonable jury could have believed him," and that in

18  assessing the propriety of summary judgment, the court below, "should not have relied on such

19  visible fiction; it should have viewed the facts in the light depicted by the videotape." *Id*. at 380-

20  381.

21         However unlikely it may presently seem that a jury will accept Salazar as more credible than

22  the police officers and the lay witnesses, this is not an instance of the testimony of an individual

23  pitted against a mechanically-recorded visual depiction of the events.  Additionally, just as the jury

24  will hear some discrepancies in the officers' and lay witnesses various descriptions of what

25  occurred, it will not necessarily have to credit *all* of what Salazar says to arrive at an overall view of

26  the incident that could differ in some significant degree from the picture presented by the City

27  defendants in this motion.  In short, this is not a case where one version of events can just be

28  disregarded, and summary judgment therefore would be inappropriate.  Furthermore, defendants do

United States District Court

For the Northern District of California

1  not, and could not, contend that qualified immunity would apply were Salazar's version of events to

2  be found true.  Accordingly summary judgment must be denied as to the excessive force claim, both

3  because there exist factual disputes as to whether the force exercised was reasonable and as to

4  whether qualified immunity would apply.

5          In opposing the motion, plaintiffs have minimized the degree to which they rely on Salazar's

6  testimony, arguing instead that even if events unfolded more or less as described by the police

7  officers, they still exercised excessive force, particularly in deploying a Taser device.  Plaintiffs'

8  argument is based both on their view that Salinas did not pose a significant *immediate* threat, and

9  that Taser devices represent a level of force and a degree of risk that should not be employed absent

10  more extreme circumstances.  Careful consideration has been given to whether it would serve a

11  useful purpose to engage in a complete analysis of these additional points of controversy between

12  the parties at this juncture.  If the conclusion of such an analysis were to favor plaintiffs, it could

13  serve as an additional basis for denying summary judgment on the excessive force claim.  A

14  conclusion in defendants' favor, however, would only be advisory, particularly given that the factual

15  record at trial likely will differ in at least some details from that presently before the Court.

16          Moreover, it appears likely that by the time this action proceeds to trial, the Ninth Circuit

17  will have issued its *en banc* opinions in *Brooks v. City of Seattle*, 08-15567EB, and *Mattos v.*

18  *Agarano*, 08-35526EB, both of which may provide important further guidance on how the

19  constitutionality of the use of a Taser device should be evaluated, and when qualified immunity

20  applies to such uses.  Accordingly, the Court declines to consider the extent to which the City

21  defendants might be able to show either that there was no constitutional violation or that the officers

22  are entitled to qualified immunity if the facts prove to be substantially consistent with their version

23  of the events.

24

25          4.   *Other claims*

26          Plaintiffs have conceded that summary judgment on their *Monell*[2] claim is appropriate, so

27  that prong of the City defendants' motion will be granted.  The City defendants contend that

28  —————————————
[2]   *See Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978).

United States District Court
For the Northern District of California

1   plaintiffs' claim under the Fourteenth Amendment involves a higher standard of culpability than the

2   Fourth Amendment claims, and that therefore they would be entitled to summary judgment on that

3   claim even if triable issues of fact exists as to whether the use of force was objectively reasonable

4   under their version of the facts.  The City defendants do not contend, however, that the Fourteenth

5   Amendment claim would not be viable upon proof of Salazar's version of events, so that prong of

6   their motion must be denied.  Finally, the City defendants challenge plaintiffs' claims under state

7   law, but again that aspect of the motion must be denied because Salazar's testimony cannot be

8   ignored.

9

10          B.  Taser

11          1.  *Adequacy of warnings*

12          Plaintiffs' claims against Taser sound in products liability, breach of warranty, and

13   negligence.  Taser contends it is entitled to summary judgment because the undisputed facts show

14   that it provides the very warnings plaintiffs contend it should give, and those warnings are sufficient

15   as a matter of law.

16          Taser's fundamental theory of defense in this action, as reflected in its prior *Daubert*

17   challenges to plaintiffs' expert witnesses, and in the prong of its current motion directed at the

18   causation element of plaintiffs' claims, are that its products have never been scientifically shown to

19   cause death, and in fact have never been a legally cognizable contributing factor in any death.

20   Taser recognizes that use of a Taser device produces pain and stress on the human body, and that

21   some individuals have died in close temporal proximity to having been tased.  It also understands

22   that application of a Taser device can cause a person to fall down, and that there is therefore a risk

23   that an injury, potentially even a fatal injury, might result from the fall.  Taser also acknowledges

24   that there is some evidence for a phenomenon sometimes referred to as "sudden in-custody death

25   syndrome" or "excited delirium" in which a person may die from a combination of factors that are

26   not fully understood, and that in some (but not all) such instances, a Taser device may have been

27   used.  In all of these circumstances, however, Taser steadfastly maintains that use of its devices do

28   not cause the deaths in any legal sense.

11

**United States District Court**
For the Northern District of California

Taser also insists that the availability of its devices has given law enforcement an important additional tool that has in fact *saved* hundreds, if not thousands, of lives.  When an officer successfully uses a Taser device to incapacitate a suspect under circumstances where the use of deadly force would have been justified, the benefit is apparent.  Taser also claims, and it is likely true, that in many cases use of its device brings a situation under control more quickly and with less risk of injury to the suspect, officers, and bystanders than might arise from a more prolonged struggle using only other forms of non-deadly force.

Plaintiffs' theory in this action, however, is that Taser's products are *not* as safe and free from the potential of causing or contributing to death as it would have law enforcement and the public believe.  While plaintiffs presumably would see nothing wrong with a police officer deploying a Taser device under circumstances where use of a gun would otherwise be warranted, they believe that Taser has created a false sense of security that leads law enforcement to resort to using its products under circumstances that do not call for *immediate* use of force at all, or at least not force that carries any substantial risk of causing death.  By expressly marketing its products as non-lethal, Taser has, in plaintiffs' view, led law enforcement to understand that the devices can be used safely to bring quick closure to situations, thereby shortcutting an appropriate balancing of the actual risks inherent in the product against the exigencies presented by a particular incident.  Plaintiffs also contend that when a Taser device is deployed under certain conditions, it is the particular effects of the electrical charge on the body that can cause or contribute in a legally significant sense to death, not merely the generic stress of the violent confrontation.

Particularly given the limitations imposed on the scope of the testimony that plaintiffs' experts will be allowed to offer, it may be that they face an uphill battle to prove that Taser's products in fact can be lethal and that the use of one was a contributing factor in Salinas's death.  The warnings on which Taser bases this motion, however, are not directed to preventing or reducing the risks that plaintiffs contend exist.   Taser's warnings are consistent with its view that its devices do *not* in fact cause or contribute to death in any meaningful sense.  Rather, Taser offers such warnings as there is "risk that someone will get hurt or may even be killed due to physical exertion, unforeseen circumstances and individual susceptibilities," and that officers should endeavor to gain

United States District Court

For the Northern District of California

1  control of situations as promptly as possible and without excessive use of Taser devices, "in order to

2  minimize the total duration of exertion and stress experienced by the subject."  While Taser's

3  warnings and training discuss sudden in-custody death syndrome at some length, the overall

4  message is that Taser devices are not responsible for such deaths, and that an officer's priority

5  should be to exert control over subjects and place them as necessary in the care of medical

6  professionals as quickly as possible.  As such, it cannot be concluded as a matter of law that Taser

7  adequately warns against the particular risks plaintiffs contend its products pose.[3]

8

9         2.  *Causation*

10         Relying on case law from toxic tort litigation, Taser contends that plaintiffs must establish

11  both "general" (or "generic") causation and "specific" (or "individual") causation.  *See In re*

12  *Hanford Nuclear Reservation Litig.,* 292 F.3d 1124 (9th Cir. 2002).  As explained in *Hanford*,

13  "[g]eneral, or 'generic' causation has been defined by courts to mean whether the substance at issue

14  had the capacity to cause the harm alleged, while 'individual causation' refers to whether a

15  particular individual suffers from a particular ailment as a result of exposure to a substance."  *Id.* at

16  1133.  In the context of toxic substances, the distinction between general and specific causation is

17  useful, because the capability of a particular substance to cause a particular disease through

18  prolonged exposure often must be shown by epidemiological evidence.  *See id.* at 1136-1137.

19  Where the mechanism by which the injury is caused can be shown more directly, however, the

20  distinction is less important.  *Id.*

21  _____

22  [3]  In *Marquez v. City of Phoenix*, 2010 WL 3342000 (D.Ariz. 2010) Taser obtained summary
    judgment that its warnings were adequate.  It is not entirely clear from the opinion what the

23  *Marquez* plaintiffs may have been contending the inadequacies of the warnings were, but to the
    extent their claims were not distinguishable from those made by plaintiffs here, the Court is not

24  persuaded that summary judgment is appropriate, for the reasons set out above.  Taser also argues
    that plaintiffs cannot show that the police officers in this case would have acted any differently had

25  other warnings been provided.  While there is evidence that Officer Chikayasu was aware that Taser
    devices have been alleged to cause death in some instances and that he believed that to be true, it

26  would be unduly speculative to conclude, as a matter of law, that he and the other officers on the
    scene would have taken the same actions had Taser not consistently marketed its products as non-

27  lethal, but instead warned explicitly that they can cause or contribute to death in some
    circumstances.

28

13

1        Here, plaintiffs will indeed have to prove both that Taser's products are capable of causing

2   or contributing to death and that one did so in Salinas' particular case.  Plaintiffs insist they will

3   carry that burden, not by introducing epidemiological studies, but by direct evidence of how they

4   contend the electrical charge produced by a Taser device acts on the body.  In this motion, Taser

5   effectively renews arguments it made in its *Daubert* challenges to plaintiffs' experts.  As reflected in

6   the rulings on those motions, there may be some gaps in plaintiffs' proof that will be difficult to fill,

7   but it cannot be determined at this juncture that the evidence will be insufficient to permit a jury to

8   find causation.  Accordingly, Taser's motion must be denied.

9

10                        V.  CONCLUSION

11       Partial summary judgment is hereby granted in favor of the City defendants on plaintiffs'

12  *Monell* claim, their claim for unlawful entry, and their contention that the police officers lacked a

13  basis to attempt to detain and/or arrest Salinas.  The motions are otherwise denied.  A further Case

14  Management Conference shall be held on June 2, 2011, at 10:00 a.m.

15

16  IT IS SO ORDERED.

17

18  Dated: 5/2/11                               _____

19                                  RICHARD SEEBORG
                                    UNITED STATES DISTRICT JUDGE

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California